NOT FOR PUBLICATION

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

RICHARD SUNDQUIST,

        Plaintiff,

v.

STACY UDIJOHN, et al.

        Defendants.

Civil No. 11-05364 (JAP)

**OPINION**

PISANO, District Judge.

Plaintiff Richard Sundquist filed this current action on September 16, 2011, alleging that his constitutional rights were violated when he was not afforded a timely civil commitment hearing in accordance with New Jersey's civil commitment statute. Before this Court are two motions for summary judgment: one filed by Plaintiff and one filed by Defendants [ECF Nos. 48, 49]. The Court decides these matters without oral argument pursuant to Federal Rule of Civil Procedure 78. For the reasons set forth below, the Court will deny Plaintiff's motion for summary judgment and grant Defendants' motion for summary judgment.

    **I.**    **Background**

The Court finds that the following facts are supported by the evidence of record and are undisputed.[1]

---

[1] These facts are derived from Plaintiff's Statement of Undisputed Facts and the exhibits attached to Plaintiff's Motion, Defendants' Statement of Material Facts and the exhibits attached to Defendants' Motion, as well as the other filings of record in this case.

At all times relevant here, the Office of Court Coordination ("OCC") at Trenton Psychiatric Hospital ("TPH") employed Donald Newsom, Principal Clerk Typist, Stacy Udijohn, Clerk Typist, and Manoj Thomas, Health Information Management Administrator and Privacy Officer.  Mr. Newsom is not a defendant here.  Defendant Thomas was in charge of the OCC.  Defendant Dr. Lawrence Rossi is the Clinical Director of TPH, and he supervised the OCC.  Defendant Dr. Evan Feibusch is the Chief of Psychiatry at TPH.  He reports to Dr. Rossi, and supervise the members of the psychiatric staff.  Defendant Theresa McQuaide is the Chief Executive Officer of TPH.

Generally, the OCC unit operates as a "clearing house" in that it processes information received from the courts and sends it out to designated areas.  If a court orders a patient to be civilly committed, the OCC notifies the treatment team that the commitment process needs to be started.  Once the information is passed on to the patient's treatment team, it is up to the treatment team to decide what to do with the patient and begin the civil commitment process.   The OCC's job is only to collect information, enter the data, and pass it along.  The OCC does not follow-up any notification sent to a treatment team, apparently because the treatment teams know to immediately start the commitment process as part of their employment responsibilities.   The OCC would not know if the evaluations were not done by the treatment teams unless the OCC was contacted by someone from the courts asking where the evaluations were on a patient.

The treatment team meets with the patient to see if he meets commitment criteria and, if so, prepares the appropriate certifications for the court.  Once the commitment papers are prepared, they are not sent back to the OCC, but are rather sent to the Admissions Unit for forwarding to the court for a temporary commitment order to be signed.  Once the order is signed, it is returned to the OCC, which then forwards it to the county adjuster who schedules the initial hearing.

Plaintiff Richard Sundquist was admitted to the TPH on June 24, 2009 pursuant to an order dated May 8, 2009 by Judge Morley in Burlington County, New Jersey, for evaluation of his competency to stand trial on criminal charges. The order scheduled a competency hearing for August 21, 2009. Patients committed pursuant to such an order are referred to administratively as on "IST" (incompetent to stand trial) status. On August 7, 2009, Dr. Carolina E. Diao prepared a report finding Plaintiff incompetent to stand trial. This report was sent to the Court on August 12, 2009. After the hearing held on August 21, 2009, Judge Morley's law clerk called the OCC. The clerk told Mr. Newsom that a new hearing had been scheduled for November 6, 2009, and that a report would be due two weeks prior to that date. No former order was entered.

On October 8, 2009, however, Judge Morley entered an order dismissing Plaintiff's criminal charges and ordering that he be civilly committed pursuant to N.J. Stat. Ann. § 30:4–27.20. The order also required the prosecutor's office to forward certain discovery materials and the reason that the court was seeking civil commitment to the county adjuster, who was thereafter ordered to forward the documents to the judge presiding over the civil commitment hearing, to the defendant's attorney, and to the attorney who would represent the State at the hearing. This order was not sent to the OCC.

Because no one at TPH had notice that Plaintiff's legal status had changed, Dr. Rumiana Radic prepared the previously-ordered report on October 20, 2009, finding that the Plaintiff was now competent to stand trial. On October 26, 2009, Mr. Newsom called the Court to see if Dr. Radic had to attend the scheduled November 6, 2009 hearing, and asked if Plaintiff could be sent back to jail because Dr. Radic had found Plaintiff competent. He was told that the hearing was not on the schedule and that someone would get back to him. On October 27, 2009, Judge Morely's team leader spoke to Mr. Newsom and informed him of the dismissal and civil commitment order,

and faxed him a copy of the October 8, 2009 Order. Plaintiff's criminal attorney confirmed that he forgot to send a copy of the order to TPH, and apologized to Mr. Newsom.

On the same day, October 27, 2009, Mr. Newsom sent an email to Anita Tillman and Dr. Radic, and copied Defendants Feibusch, Thomas, and Udijohn, as well as Drs. Georges Dubois and Rajani Patel, and David Kensler. Drs. Dubois and Patel were two other psychiatrists in Plaintiff's unit. Mr. Newsom advised them of his discovery and informed them that "the team must begin the commitment process." *See* Certification of Stacy Udijohn ("Udijohn Cert.") Ex. F. Ms. Tillman is the program coordinator of the treatment team on Drake East Two, the unit to which Plaintiff was assigned. It was her responsibility to make sure the evaluations for civil commitment were completed and that the civil commitment process was done in a timely matter. Mr. Newsom also faxed a copy of the Order to Ms. Tillman. Mr. Kensler, the Complex Administrator of the unit in which Plaintiff resided, sent an email to Mr. Newsom, Ms. Tillman, and Dr. Radic in reply to Mr. Newsom's email, asking if Plaintiff met the commitment criteria. The record indicates that there was no reply to this email until November 17, 2009.

On November 17, 2009, Defendant Udijohn learned for the first time that nothing had been done in response to the emails sent by Mr. Newsom and Mr. Kensler. She then sent an email directed to Mr. Kensler, Ms. Tillman, Dr. Dubois, and Dr. Patel, informing them of the lapse and inquiring to if Plaintiff met the criteria to be civilly committed. Ms. Tillman responded in an email that she had reviewed the case and discovered Plaintiff "was being carried by Unit Nursing staff as an IST and [she] did correct the problem this morning." *Id.* at Ex. G.

Plaintiff learned that the criminal charges against him had been dismissed during a meeting with his treatment team on October 29, 2009. It is disputed whether or not Plaintiff informed a social worker and psychologist at that time that he wished to be released. On November 18, 2009,

4

Plaintiff informed Marilyn Spensley, a senior advocate with Disability Rights New Jersey who was working with him in an unrelated forced medication case, that he was being held without a valid commitment order.  It does not appear that Plaintiff alerted anyone else that he was being held without a valid commitment order.

On November 19, 2009, Drs. Patel and Dubois prepared Clinical Certifications for Involuntary Commitment for Plaintiff, and an Application for Involuntary Commitment was presented to the Court that same day.  On November 20, 2009, a Temporary Order for Involuntary Commitment was entered, scheduling a hearing on the need for continued involuntary commitment for December 10, 2009.  This hearing was scheduled by the appropriate county adjuster.  When the court calendar was finalized the Friday before the week the hearing was scheduled for, the hearing date was moved up to December 9, 2009.  On December 9, 2009, the initial civil commitment hearing was conducted, and an order civilly committing Plaintiff was entered.  Plaintiff was placed on continued commitment status until September 9, 2010, at which time he was placed on Continual Extension Pending Placement ("CEPP") Status.  Plaintiff was eventually discharged on October 29, 2010.  There is no evidence that there has been any other instances prior to Plaintiff where a patient at TPH did not have a timely civil commitment hearing.  Plaintiff would have been treated no differently if he was on IST or involuntary commitment status.

Plaintiff instituted this action on September 16, 2011, alleging that the Defendants violated N.J. Stat. Ann. § 30:4–27.10, which requires that a person involuntarily committed to a psychiatric hospital have a civil commitment hearing within twenty days of initial inpatient admission.  Under the First Count of Plaintiff's Complaint, Plaintiff asserts a claim under 42 U.S.C. § 1983, alleging that this detention without a hearing for sixty-three days denied Plaintiff of liberty without due process of law, constituting a violation of his rights under the Fifth and Fourteenth Amendments of

the United States Constitution. The Second Count alleges that the Defendants subjected Plaintiff to an unreasonable seizure of his person in violation of the Fourth Amendment, and the Third Count alleges that Defendants denied Plaintiff the day in court to which he was entitled in violation of the First Amendment.

On July 17, 2010, this Court granted in part and denied in part Defendants' motion for summary judgment. The case was allowed to proceed against Defendants Udijohn, McQuaide, and Rossi in their individual capacities. Plaintiff then obtained leave from the Court to file a First Amended Complaint. This Amended Complaint added two new defendants, Mr. Thomas and Dr. Feibusch, but the factual allegations and claims remained unchanged from the original complaint. After discovery concluded, these pending motions for summary judgment were filed.

## II.   Standard of Review

Federal Rule of Civil Procedure 56(a) provides that "a court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The substantive law identifies which facts are material. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A material fact raises a "genuine" issue "if the evidence is such that a reasonable jury could return a verdict" for the non-moving party. *Healy v. N.Y. Life Ins. Co.*, 860 F.2d 1209, 1219 n.3 (3d Cir. 1988).

The Court must consider all facts and their logical inferences in the light most favorable to the non-moving party. *Pollock v. Am. Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986). The Court shall not "weigh the evidence and determine the truth of the matter," but need determine only whether a genuine issue necessitates a trial. *Anderson*, 477 U.S. at 249. While the moving

party bears the initial burden of showing the absence of a genuine issue of material fact, meeting this obligation shifts the burden to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." *Id.* at 250. If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, . . . there can be no genuine issue of material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 n.5 (3d Cir. 1992) (quotation omitted). If the non-moving party fails to demonstrate proof beyond a "mere scintilla" of evidence that a genuine issue of material fact exists, then the Court must grant summary judgment. *Big Apple BMW v. BMW of N. Am.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

**III.   Discussion**

In their motion for summary judgment, Defendants argue that Plaintiff has failed to establish a constitutional violation and that, even if he had, Defendants are entitled to qualified immunity. Defendants also argue that Defendants Rossi, McQuaide, Feibusch, and Thomas cannot be found liable, because Plaintiff is suing them on a theory of respondeat superior. Plaintiff has likewise moved for summary judgment, arguing that each Defendant has violated his right to due process under the law.

A plaintiff may have a cause of action under 42 U.S.C. § 1983 for certain violations of his constitutional rights. Section 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.  Thus, to state a claim for relief under § 1983, a plaintiff must allege, first, the violation of a right secured by the Constitution or laws of the United States, and second, that the alleged deprivation was committed or caused by a person acting under color of state law.  *See Harvey v. Plains Twp. Police Dep't*, 635 F.3d 606, 609 (3d Cir. 2011) (citations omitted); *see also West v. Atkins*, 487 U.S. 42, 48 (1988).

"Under § 1983, every person who, acting under color of state law, 'subjects or causes to be subjected' another person to a deprivation of a federally secured right is liable for that transgression." *Sample v. Diecks*, 885 F.2d 1099, 1113 (3d Cir. 1989).  There are two ways one can be liable under § 1983: "One can be liable for one's own constitutional tort, that is, for 'subjecting' the plaintiff to the constitutional violation. Or one can be liable, under appropriate circumstances, for someone else's constitutional tort, that is, for 'causing' the plaintiff to be subjected to the constitutional violation." *Id.*  A plaintiff must prove "specific conduct by state officials which violates some constitutional right of the complainant . . . ." *Gittlemacker v. Prasse*, 428 F.2d 1, 3 (3d Cir. 1970)

In order to be liable under § 1983 as supervisors, individual state officials must have "personal involvement in the alleged wrongdoing; liability cannot be predicated solely on the operation of respondeat superior." *Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005) (quoting *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988)).  If a party is alleging that a supervisor was inadequate or otherwise failed in his or her duties as a supervisor, a plaintiff may not merely "argue that the constitutionally cognizable injury would not have occurred if the supervisor had done more than he or she did." *Brown v. Muhlenberg Twp.*, 269 F.3d 205, 216 (3d Cir. 2001) (citing *Diecks*, 885 F.2d at 1118).  This is because a "'person' is not the 'moving force [behind] the constitutional violation' of a subordinate, unless that 'person'—whether a natural one or a

municipality—has exhibited deliberate indifference to the plight of the person deprived." *Diecks*, 885 F.2d at 1118 (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)) (citation omitted). The plaintiff must also "persuade the court that there is a relationship between the 'identified deficiency' and the ultimate injury.'" *Brown*, 269 F.3d at 216 (quoting *Diecks*, 885 F.2d at 1118). If the party is alleging that the supervisor defendant has created or established a practice or policy that has creates an unreasonable risk of a constitutional violation, a party can establish supervisory liability by:

> (1) identify the specific supervisory practice or procedure that the supervisor failed to employ, and show that (2) the existing custom and practice without the identified, absent custom or procedure created an unreasonable risk of the ultimate injury, (3) the supervisor was aware that this unreasonable risk existed, (4) the supervisor was indifferent to the risk; and (5) the underling's violation resulted from the supervisor's failure to employ that supervisory practice or procedure.

*Id.*

Plaintiff argues that each of the Defendants have subjected or personally caused Plaintiff's deprivation of liberty "by retaining custody and control of Plaintiff without initiating civil commitment proceedings against him in a timely matter so that he would have a civil commitment hearing within 20 days of his admission to TPH." Am. Compl. ¶ 14. Specifically, Plaintiff argues that each Defendant failed to act when they had a duty to in order to insure that Plaintiff would not be confined without a valid legal order, and also argues that the "defendants acted with deliberate indifference to the fact that there was no system or procedure in place to insure that the plaintiff, or any other patient at TPH, would not be confined with a valid legal order." Pl.'s Opp. Br. at 10.

### A. Defendant Stacy Udijohn

Defendant Udijohn has been employed by the State of New Jersey as a Clerk Typist at the TPH in the OCC since 2007, and was employed in such a position on October 8, 2009. As the undisputed facts establish, the OCC operated essentially as a "clearing house," passing along

9

information to the necessary treatment team and then checking involuntary commitment papers for completeness before sending them to the appropriate county adjuster for scheduling of commitment hearings.  Accordingly, as a Clerk Typist in the OCC, if Defendant Udijohn received a court order mandating that an individual be civilly committed, she would notify all the members of the individual's treatment team, alerting them that the commitment process needs to start to determine if the patient meets the criteria to be committed.  Thereafter, the treatment team was responsible for processing the appropriate certifications for the court.  The OCC was not responsible for telling the treatment team to have the commitment papers done by a certain date, because the treatment team was supposed to process them immediately.  After the treatment team completed the commitment papers, they would send the papers to the Admissions Unit (a distinct unit from the OCC) for forwarding to the Court for a temporary order of commitment to be signed by a judge.  The papers were then returned to the hospital, specifically to the Admissions Unit.  A copy of the papers were then sent to the OCC, where Udijohn was responsible for logging that information into the logbook and sending the notice and commitment papers to the appropriate country adjuster.  The county adjuster was responsible for scheduling the hearing for the civil commitment, and then returning a copy of the commitment papers and the hearing notice to the OCC.

It is undisputed that Defendant Udijohn was copied on the email that Mr. Newsom sent on October 27, 2009, which explained the failure of Plaintiff's criminal defense attorney to send a copy of the October 8 Court Order that mandated Plaintiff be civilly committed and advising the treatment team to begin the commitment process.  It is also undisputed that Udijohn was not responsible for any further response once the treatment team was alerted and that the email was not addressed to her nor asked her to do anything.  Further, when Udijohn was eventually alerted to Plaintiff's situation, she immediately acted in accordance with her job.  She reached out to the

appropriate treatment team and informed them of the background of the case, and asked the treatment team if Plaintiff met the criteria for commitment, explaining that something needed to be done "ASAP."  *See* Declaration of Stacy Udijohn Ex. G.  This was also the first time that Udijohn learned that no action had been taken in response to Mr. Newsom's email.  Three days after Udijohn alerted the treatment team, a temporary order for involuntary commitment was entered and a hearing was scheduled on the need for the continued involuntary commitment of Plaintiff.

Plaintiff argues that Udijohn failed to "follow through" with the civil commitment process by not paying attention to the fact that the certificates were not submitted immediately.  The OCC, however, was not responsible for processing initial commitment evaluations; rather, once they notified the relevant treatment team of the necessity of starting a commitment evaluation, their responsibility ended until such time as they received a temporary commitment order from the Admissions Unit and forwarded it to the county adjuster to schedule a hearing.   Further, simply being copied on an email sent by her co-worker is not enough to impose a duty on Udijohn.  Rather, Udijohn acted promptly as soon as it can be fairly said that she had actual knowledge of Plaintiff's situation, as she emailed the treatment team to begin the commitment process of Plaintiff as soon as possible, stressing the urgency of Plaintiff's situation.  Udijohn was not responsible for processing initial commitment evaluations nor was there a duty on her to follow up after she notified the treatment team to begin the commitment process; she was only responsible for notifying the treatment team of the necessity to do so.  The Court will not impose liability on Udijohn for failing to do something she had no legal responsibility to do.  Overall, Plaintiff has failed to point to any action or omission on Defendant Udijohn's part that violated Plaintiff's constitutional rights.  *See Gittlemacker*, 428 F.2d at 3.   Accordingly, the Court finds that these undisputed facts do not

create a genuine issue for trial and will deny Plaintiff's motion for summary judgment and enter judgment in favor of Defendant Udijohn.

### B. Supervisor Defendants

Defendants McQuaide, Rossi, Thomas, and Feibusch all have supervisory positions at TPH. Plaintiff's claims against these Defendants are based on their failure to execute their individual responsibilities as supervisors in such a way as to avoid violating Plaintiff's rights. Therefore, the Court must review the alleged inadequacy of their supervision. *See Brown*, 269 F.3d at 216.

First, Plaintiff argues that Defendant McQuaide was "responsible for the admission and retention of [P]laintiff to TPH . . ." and that she "failed to implement or promulgate any policies regarding her supervision of the admission and retention of patients to TPH." Pl.'s Br. at 11. The record, however, is completely devoid of any evidence that McQuaide was actually aware of Plaintiff's presence at TPH until it was brought to her attention after the events at issue here. Because McQuaide supervises a staff of approximately 1,200 employees who care for approximately 450 patients, it is unreasonable to assert that McQuaide should, by reason of being CEO, know of every patient that enters TPH.

Next, with regard to Plaintiff's assertions regarding the policies that McQuaide allegedly failed to implement, Plaintiff has failed to prove the necessary elements under the *Diecks* test, *see* 885 F.2d at 1118; importantly, Plaintiff has failed to specifically identify anything that McQuaide failed to do that evidences her deliberate indifference. While "deliberate indifference to a known risk will ordinarily be demonstrated by evidence that the supervisory official failed to respond appropriately in the face of an awareness of a pattern of such injuries," the record in this case does not affirmatively show a pattern of injuries similar to Plaintiff. *Id.* Nor does it show any indication that Defendant McQuaide was aware of any such incident. Rather, it appears that Plaintiff is

improperly relying on a theory of respondeat superior, and has failed to establish any wrongdoing on McQuaide's behalf. Accordingly, the Court finds that there is no genuine issue for trial, and summary judgment must be entered in favor of Defendant McQuaide.

Plaintiff also argues that Defendant Rossi was liable because he was the clinical director at TPH and should have been aware that Plaintiff was ordered to be civilly committed by the October 8 Order and failed to order Dr. Feibusch to immediately assign a psychiatrist to conduct the evaluations. Plaintiff asserts that Defendant Rossi "had no policy or mechanism in place in the OCC to ensure that civil commitment hearings would be held on a timely basis." Pl.'s Opp. Br. at 14. The record, however, fails to show any evidence that Dr. Rossi was aware that Plaintiff had been ordered to be civilly committed on October 8. While the record is not clear when Dr. Rossi found out about Plaintiff, there is no evidence that he was copied on the initial October 27 email or Udijohn's November 17 email, nor is there any evidence of any individual telling him about Plaintiff's case. The Court cannot assume that Dr. Rossi knew about Plaintiff simply because he was the clinical director. Without any evidence that Dr. Rossi knew about Plaintiff, there is no basis to Plaintiff's argument that Dr. Rossi should have told Dr. Feibusch to appoint someone to immediately begin an evaluation. Further, this argument ignores the policy in place at the TPH, in which a treatment team knew to immediately begin the commitment process once they received notice of a court order. *See Diecks*, 885 F.2d at 1110 (explaining that "not every official who is aware of a problem exhibits indifference by failing to resolve it" if "there are procedures in place calling for others to pursue the matter"). Plaintiff's argument is based more upon speculation than the actual record. Importantly, he has failed to identify any "specific acts or omission of the supervisor that evidence deliberate indifference" or to persuade the court that there is a relationship between the identified deficiency and the ultimate injury." *Brown*, 269 F.3d at 216 (internal

13

quotation omitted).  Finally, for the same reason that Plaintiff's argument concerning the lack of policy in place for Defendant McQuaide, the Court finds no basis for Plaintiff's argument concerning the alleged lack of policy or mechanism in place to ensure that civil commitment hearings were timely.  Accordingly, the Court finds that there is no genuine issue for trial, and summary judgment must be entered in favor of Defendant Rossi.

Next, Plaintiff alleges that Dr. Feibusch, as the chief of psychiatry, displayed deliberate indifference to Plaintiff's constitutional violation by failing to require his subordinates to perform the evaluations on Plaintiff in a timely manner.  Specifically, Plaintiff argues that Dr. Feibusch's "lack of response and failure to order his subordinates to evaluate the plaintiff in a timely manner was what ultimately caused the plaintiff to be held at TPH illegally for 63 days."  Pl.'s Opp. Br. at 16.  Plaintiff, however, has failed to provide any factual basis for these arguments.  While it is true that Dr. Feibusch was copied on the email sent out October 27 by Mr. Newsom, the email was not directed at him and did not ask him to do anything.  The standard procedure at TPH was that the treatment team would be directed to begin commitment proceedings by the OCC; here, the treatment team was instructed to begin the proceedings on October 27.  As the Third Circuit expressed in *Diecks*, "obviously, not every official who is aware of a problem exhibits indifference by failing to resolve it," particularly "when there are procedures in place calling for others to pursue the matter."  885 F.2d at 1110.  There is no evidence that Dr. Feibusch had any reason to think that the treating psychiatrist would not timely start the process; for example, there was no evidence that such an event had happened before or that the treating psychiatrist might not timely start the process making it a risk that such an incident may occur.  It may be the case that if Dr. Feibusch had ordered his subordinates to evaluate Plaintiff it might have been done sooner; on the other hand, it may have been the case that it still would not have been done until Udijohn sent out her email.  Such a

statement is purely speculative, and is nothing more than an attempt to argue that Plaintiff's injury would not have occurred if Dr. Feibusch did more. This is insufficient. *See Diecks*, 885 F.2d at 1118. At worst, Dr. Feibusch could be called negligent, but the record needs to establish a question of fact regarding Dr. Feibusch's alleged deliberate indifference, a standard that requires a state of mind greater than mere negligence. *See Herman v. Clearfield Cnty.*, 836 F. Supp. 1178, 1184 (W.D. Pa. 1993) *aff'd*, 30 F.3d 1486 (3d Cir. 1994) ("The phrase 'deliberate indifference' was coined by the Supreme Court in *Estelle v. Gamble*, 429 U.S. 97, 104 (1976), to describe a state of mind less than willful but greater than negligence."). There is no such evidence in the record. Therefore, the Court finds that there is no genuine issue for trial, and summary judgment must be entered in favor of Defendant Feibusch.

      Finally, Plaintiff argues that Defendant Thomas, as the supervisor of the OCC, was deliberately indifferent to Plaintiff's rights when he neither spoke with his supervisor, Dr. Rossi, nor reached out to the treatment team to request the documents he needed to initiate the civil commitment process in a timely manner. Once again, this argument is unsupported by the record. It is undisputed that Thomas was copied on the email that Mr. Newsom sent out on October 27, alerting the treatment team that they should start the commitment process. It is also undisputed that the OCC's obligations ended there until such time as they received a temporary commitment order from the Admissions Unit and forwarded it to the county adjuster to schedule a hearing. Once Udijohn discovered that the commitment process had not yet begun, she notified the treatment team once again to immediately start the commitment process. While Defendant Thomas could reach out to the treatment team and/or his supervisor if he knew that there was a report missing, there is no evidence on the record that he was ever told that the report was missing. His job was to supervise the OCC, in its role as the TPH "clearing house." There is no dispute that the OCC employees

immediately notified the treatment team when they received notice of the October 8 Order, as well as when they were alerted to the fact that Plaintiff had no legal status. Defendant Thomas's liability seems to be based upon the fact that he was copied on the October 27 email, but the email did not instruct him to do anything. Accordingly, the Court finds that there is no genuine issue for trial, and summary judgment must be entered in favor of Defendant Thomas.

Overall, Plaintiff seems to be relying on the argument that his "constitutionally cognizable injury would not have occurred if the superior had done more than he or she did." *Diecks*, 885 F.2d at 1118. As the *Diecks* Court recognized, this is not enough. Plaintiff's claims for supervisory liability against any of the named supervisor Defendants needed to establish that each or any Defendant "exhibited deliberate indifference to the plight of the person deprived." *Id.* The facts here do not create any genuine factual dispute regarding the actions of Defendants here. Although Plaintiff argues that Defendants each subjected or caused Plaintiff to be subjected to having his constitutional rights violated, his conclusory and speculative allegations do not create a jury issue or establish liability on the parts of the Defendants.[2] Because the record could not lead a rational trier of fact to find for Plaintiff, there is no genuine issue for trial and summary judgment must be entered in favor of the supervisory Defendants as well. *See Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).

---

[2] The Court cannot help but wonder what the actual case was in this situation. If Plaintiff had started his civil commitment process earlier, he would have been in no better or worse position. Plaintiff was eventually civilly committed when he had his hearing, and was involuntary committed until October 29, 2010. While the Court recognizes the very serious constitutional violation of being deprived of one's liberty, it does not appear that Plaintiff was actually deprived of any actual "liberty." Rather, he was a patient at TPH who was (wrongly) labeled as an IST until he was eventually civilly committed from December 2009 until October 2010. There is no dispute that patients are treated the same whether they are classified as IST or involuntary committed.

**IV.     Conclusion**

Overall, it appears that there was a period of time in which Plaintiff was being held in TPH without a lawful order, which is a violation of his constitutional rights.  This incident, however, was unintentional and appears to have been the first of its kind.  Without any awareness that there may be a problem with the procedure, the Court cannot find Defendants liable for putting faith in it successfully working.  Likewise, the Court cannot impose liability on Defendants for failing to go above and beyond what their job entails.  Instead, the record reveals that there was a breakdown in the administrative procedure at TPH that was quickly fixed once Defendant Udijohn found out that no action had been taken in response to a colleague's earlier email.  Accordingly, for the forgoing reasons, the Court must grant summary judgment in favor of Defendants and deny Plaintiff's motion for summary judgment.  An appropriate Order accompanies this Opinion.

/s/ Joel A. Pisano
JOEL A. PISANO, U.S.D.J.

Dated: July 1, 2014